NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough - northern judicial district
No. 2014-028


JONATHAN DUCHESNE & a.

v.

HILLSBOROUGH COUNTY ATTORNEY

Argued: March 5, 2015
Opinion Issued: June 25, 2015


Milner & Krupski, PLLC, of Concord (John S. Krupski on the brief and orally), for the petitioners.


Hillsborough County Legal Counsel, of Goffstown (Carolyn M. Kirby on the brief and orally), for the respondent.


LYNN, J. The petitioners, Jonathan Duchesne, Matthew Jajuga, and Michael Buckley, appeal a decision of the Superior Court (Garfunkel, J.) denying their request for a declaratory judgment and an injunction to remove their names from the so-called "Laurie List."[1] We reverse and remand.

_____

[1] See State v. Laurie, 139 N.H. 325 (1995).

# I

The trial court found, or the record supports, the following facts. The petitioners are officers of the Manchester Police Department. On March 3, 2010, while off duty, the petitioners were involved in an incident at a bar in Manchester. The incident was widely reported in the media, and the Manchester chief of police ordered a criminal and internal affairs investigation. Following the investigation, the chief found that the petitioners had violated several departmental policies, including a prohibition against the unnecessary use of force, and each officer was suspended for a period of time. On August 2, the chief sent letters to the Hillsborough County Attorney's Office stating that the petitioners had "engaged in conduct (excessive use of force) that may be subject to disclosure under State v. Laurie." Consequently, the county attorney placed the petitioners' names on the "Laurie List," which the trial court described as "an informal list of police officers who have been identified as having potentially exculpatory evidence in their personnel files or otherwise."

Pursuant to the provisions of the collective bargaining agreement (CBA) between the petitioners' union and the City of Manchester, the petitioners filed grievances regarding the discipline imposed by the chief. The CBA provides for final and binding arbitration. After a hearing, an arbitrator found that "the City of Manchester did not have just cause to take disciplinary action against [the petitioners] for actions taken or not taken" during the incident. As a result of this decision, the petitioners were compensated for lost earnings and information regarding the incident was removed from their personnel files.

While this process was occurring, the New Hampshire Attorney General's Office conducted an independent criminal investigation into the incident. Its final report concluded that the petitioners' conduct "was justified under New Hampshire law and no criminal charges are warranted."

On January 31, 2012, after the arbitration decision, the chief wrote to the then Hillsborough County Attorney requesting that, pursuant to the arbitrator's award, the petitioners be removed from the "Laurie List." The county attorney declined, stating that there was an injured party, the chief "reported the incident as excessive force for the purposes of the Laurie list," and there was "a sustained complaint of excessive use of force." The petitioners also asked the attorney general to direct the county attorney to remove the petitioners from the "Laurie List" — a request that the attorney general declined.

The petitioners then filed suit in superior court against the respondent, the Hillsborough County Attorney[2], seeking: (1) a declaratory judgment that the county attorney violated RSA 105:13-b (2013) by refusing to remove their

---

[2] We refer to the Hillsborough County Attorney using gender-neutral language.

names from the "Laurie List"; (2) an injunction to prohibit the county attorney from designating the incident as a "Laurie Issue"; and (3) a writ of mandamus to compel the county attorney to remove their names from the "Laurie List." The petitioners also argued that the county attorney's refusal to remove them from the "Laurie List" violated their constitutional rights to due process of law, and requested an award of attorney's fees.

After a hearing, the trial court denied the petitioners relief. In its written order, the court stated that the petitioners asked for a prospective determination "that their involvement in [the] incident can never rise to the level of potentially exculpatory evidence." The court found, however, that it could not "prospectively determine if the information may be exculpatory in a case that has not yet been brought." The court reasoned that such a determination would substitute the court's judgment for that of the prosecutor, and would relieve prosecutors of their legal and ethical duty to disclose potentially exculpatory information. The petitioners moved for reconsideration, which was denied, and this appeal followed.

On appeal, the petitioners argue that the trial court erred by deferring to the county attorney and not removing the petitioners from the "Laurie List." They contend that the trial court — not the prosecutor — ultimately reviews personnel files or other officer background information for exculpatory evidence and decides if such records or information must be disclosed to the defendant. They further assert that, with respect to each of them, the arbitrator's decision and the attorney general's report establish that the allegations of excessive use of force were unfounded, and, therefore, inclusion of their names on the "Laurie List" or disclosure of their names to a court or defendant in a future criminal case based upon the incident is unwarranted. The petitioners also argue that the trial court erred by not addressing their request for an injunction and writ of mandamus, their constitutional arguments, or their request for attorney's fees.

The respondent contends that the trial court cannot look ahead to future, hypothetical cases as the petitioners asked it to do. It argues that the responsibility to disclose exculpatory evidence lies with the prosecutor, and that the county attorney's office is not bound by the arbitrator's award or the attorney general's report. The respondent asserts that, depending upon the facts of a particular case, its prosecutors may properly conclude that the petitioners' involvement in the incident should be disclosed to the defendant, or at least may conclude that the incident should be disclosed to the trial judge to determine whether the incident must be disclosed to the defense and/or is admissible at trial. The respondent also argues that RSA 105:13-b is not implicated here inasmuch as the arbitrator's decision resulted in the removal from the petitioners' personnel files of information pertaining to the incident.

Before turning to the specific issues before us, we examine the background of the "Laurie List." The starting point for our analysis is the well-recognized proposition that, in a criminal case, the State is obligated to disclose information favorable to the defendant that is material to either guilt or punishment. See Brady v. Maryland, 373 U.S. 83, 87 (1963). This obligation arises from a defendant's constitutional right to due process of law, and aims to ensure that defendants receive fair trials. United States v. Bagley, 473 U.S. 667, 675 (1985); State v. Laurie, 139 N.H. 325, 329 (1995); see also N.H. CONST. pt. I, art. 15. The duty to disclose encompasses both exculpatory information and information that may be used to impeach the State's witnesses, Bagley, 473 U.S. at 676; Laurie, 139 N.H. at 327, and applies whether or not the defendant requests the information, Bagley, 473 U.S. at 682; Laurie, 139 N.H. at 327. "Essential fairness, rather than the ability of counsel to ferret out concealed information, underlies the duty to disclose." Laurie, 139 N.H. at 329 (quotation and brackets omitted).

The duty of disclosure falls on the prosecution, Giglio v. United States, 405 U.S. 150, 154 (1972); Petition of State of N.H. (State v. Theodosopoulos), 153 N.H. 318, 320 (2006); see also N.H. R. Prof. Conduct 3.8(d), and is not satisfied merely because the particular prosecutor assigned to a case is unaware of the existence of the exculpatory information. On the contrary, we impute knowledge among prosecutors in the same office, State v. Etienne, 163 N.H. 57, 90-91 (2011), and we also hold prosecutors responsible for at least the information possessed by certain government agencies, such as police departments or other regulatory authorities, that are involved in the matter that gives rise to the prosecution, see Theodosopoulos, 153 N.H. at 320. "This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). Although police may "sometimes fail to inform a prosecutor of all they know," prosecutors are not relieved of their duty as "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." Id. at 438 (quotation omitted).

The prosecutor's constitutional duty of disclosure extends only to information that is material to guilt or to punishment. Brady, 373 U.S. at 87; Laurie, 139 N.H. at 328. "Favorable evidence is material under the federal standard only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Laurie, 139 N.H. at 328 (quotations omitted). We stated in Laurie that the New Hampshire Constitution affords defendants greater protection than the federal standard and held that, "[u]pon a showing by the

defendant that favorable, exculpatory evidence has been knowingly withheld by the prosecution, the burden shifts to the State to prove beyond a reasonable doubt that the undisclosed evidence would not have affected the verdict." Id. at 330. "This standard does not require that the prosecutor disclose everything that might influence a jury, or that the defendant be permitted a complete discovery of all investigatory work or an examination of the State's complete file." Id.

In Laurie, we held that the prosecution's failure to disclose exculpatory evidence violated the defendant's due process rights under the New Hampshire Constitution, and we ordered a new trial. Laurie, 139 N.H. at 327, 333. The evidence, which the prosecution possessed prior to trial, consisted of the employment files and records of a Franklin police officer, Detective-Sergeant Laro, who testified at the defendant's trial. Id. at 327, 330. Laro investigated the crime, was the affiant for a number of search warrants, maintained the files and paperwork for the case, and was the sole individual present when the defendant allegedly spontaneously confessed to the crime. Id. at 332. The records disclosed "numerous instances of conduct" during Laro's time at the Franklin Police Department and during his previous employment as a police officer in Massachusetts that "reflect[ed] negatively on Laro's character and credibility." Id. at 330. For example, there was information about numerous letters of complaint that detailed Laro verbally abusing, choking, or threatening to physically harm people. Id. Laro also had been suspended both for neglect of duty and for threatening a civilian with a weapon. Id. at 330-31. When he was subjected to a polygraph examination concerning other incidents, it was determined that he was not being truthful in all cases, which "resulted in court cases being tainted." Id. at 331 (quotation omitted). Laro was sent to a psychologist who said that Laro "should not be entrusted with a gun and badge." Id. (quotation omitted). There was also evidence that Laro lied about the content of his file and misrepresented his training and schooling. Id. During another investigation, while seeking medical records of one of its clients, Laro threatened to close a clinic and arrest its personnel if they did not comply, claiming that his actions were authorized by the chief of police and the county attorney. Id. There were reports from co-workers describing Laro as a "liar" and someone "not to be trusted," and reports of incidents of "inappropriate" use of firearms. Id. The file also included evidence that the attorney general's office told the Franklin police chief: "If you had a homicide tonight in Franklin, I would instruct you that Sgt. Laro not be involved in the case in any capacity." Id. at 331-32 (quotation omitted). This information bore on Laro's general credibility and could have been used by the defendant to cross-examine and impeach Laro, who was a key witness at trial. Id. at 327, 332-33. The prosecution's failure to disclose any of it, even without the defendant's asking, violated the defendant's rights and necessitated a new trial. Id. at 333.

Our decision in Laurie demonstrated the need for prosecutors and law enforcement agencies to share information that pertains to police officers who may act as witnesses for the prosecution. Since Laurie, prosecutors in New Hampshire have developed "procedures and regulations . . . to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." Kyles, 514 U.S. at 438 (quotation omitted). One aspect of these procedures is the creation of so-called "Laurie Lists." It is not entirely clear, based upon the record before us, how "Laurie Lists" actually function in practice, or how different prosecutors' offices use them. Although the respondent argues, and the trial court accepted, that the term "Laurie List" is a misnomer because no comprehensive state-wide "Laurie List" exists, it is clear from the record that at least a county-wide "Laurie List" exists in the Hillsborough County Attorney's Office. That is, it was established that the Hillsborough County Attorney keeps a list, in the form of an Excel spreadsheet, of police officers with potentially exculpatory information in their personnel files or elsewhere. Officers are added to the list when a police chief or another source notifies the county attorney that such information exists. Both at the hearing before the trial court and in its brief to this court, the respondent represented that when an officer is on the "Laurie List," such information is routinely disclosed to the trial court any time that officer appears as a witness. After the court has been given the information, the prosecutor may then argue either that the information is not exculpatory or relevant to the particular case and therefore need not be disclosed to the defense, or that, if it is disclosed to the defense, that it should not be admitted as evidence at the trial. Based upon the record before us, we understand that merely being on the "Laurie List" is enough to trigger that preliminary disclosure to the court, even if the prosecution does not believe that the evidence is material or exculpatory and fully intends to argue as much, and even if a court in a prior case has found that the information was not exculpatory or admissible. It also appears that, as the petitioners argue, there is no mechanism for an officer to be removed from the "Laurie List" once placed on it.

Although the prosecutorial duty that spawned the creation and use of "Laurie Lists" is of constitutional magnitude, the legislature has enacted a statute, RSA 105:13-b, which is designed to balance the rights of criminal defendants against the countervailing interests of the police and the public in the confidentiality of officer personnel records. We agree with the respondent's assertion that RSA 105:13-b is not directly at issue in this case, inasmuch as all information related to the incident has been removed from the petitioners' personnel files. Nonetheless, we think it helpful to discuss the statute and its requirements in order to explain how it affects the "Laurie List" as used by prosecutors. RSA 105:13-b provides:

I.  Exculpatory evidence <u>in a police personnel file</u> of a police officer who is serving as a witness in any criminal case shall be disclosed to the defendant.  The duty to disclose exculpatory evidence that should have been disclosed prior to trial under this paragraph is an ongoing duty that extends beyond a finding of guilt.

II.  If a determination cannot be made as to whether evidence is exculpatory, an in camera review by the court shall be required.

III.  No <u>personnel file</u> of a police officer who is serving as a witness or prosecutor in a criminal case shall be opened for the purposes of obtaining or reviewing non-exculpatory evidence in that criminal case, unless the sitting judge makes a specific ruling that probable cause exists to believe that the file contains evidence relevant to that criminal case.  If the judge rules that probable cause exists, the judge shall order the police department employing the officer to deliver the file to the judge.  The judge shall examine the file in camera and make a determination as to whether it contains evidence relevant to the criminal case.  Only those portions of the file which the judge determines to be relevant in the case shall be released to be used as evidence in accordance with all applicable rules regarding evidence in criminal cases.  The remainder of the file shall be treated as confidential and shall be returned to the police department employing the officer.

(Emphasis added.)  "RSA 105:13–b cannot limit the defendant's constitutional right to obtain all exculpatory evidence." <u>Theodosopoulos</u>, 153 N.H. at 321. However, particularly as amended in 2012,[3] the statute explicitly codifies the distinction we have recognized "between exculpatory evidence that must be disclosed to the defendant under the State and Federal Constitutions, and other information contained in a confidential personnel file that may be obtained through the . . . procedure set forth in [paragraph III of ] RSA 105:13–b." <u>Id</u>. at 321; <u>compare</u> RSA 105:13-b, I and II, <u>with</u> RSA 105:13-b, III.

The current version of RSA 105:13-b addresses three situations that may exist with respect to police officers who appear as witnesses in criminal cases. First, insofar as the personnel files of such officers contain exculpatory evidence, paragraph I requires that such information be disclosed to the defendant.[4]  RSA 105:13-b, I.  Next, paragraph II covers situations in which

---

[3] Prior to the 2012 amendment of the statute, RSA 105:13-b did not contain the clear distinction between exculpatory information and non-exculpatory (albeit relevant) information that is found in the present version of the statute.  <u>See</u> RSA 105:13-b (1992).

[4] Paragraph I also makes clear that the State's obligation to disclose exculpatory evidence contained in the personnel files of police witnesses is an ongoing duty that does not end with a defendant's conviction.

7

there is uncertainty as to whether evidence contained within police personnel files is, in fact, exculpatory. RSA 105:13-b, II. It directs that, where such uncertainty exists, the evidence at issue is to be submitted to the court for in camera review. Id.

Finally, paragraph III covers evidence that is non-exculpatory but may nonetheless be relevant to a case in which an officer is a witness.[5] Consistent with our case law, this paragraph prohibits the opening of a police personnel file to examine the same for non-exculpatory evidence unless the trial judge makes a specific finding that probable cause exists to believe that the file contains evidence relevant to the particular criminal case. See State v. Puzzanghera, 140 N.H. 105, 107 (1995) ("[I]n order to trigger an in camera review of a police officer's personnel file under RSA 105:13-b, the defendant must establish probable cause to believe the file contains evidence relevant to his case . . . ."). If the judge does make such a finding, the judge is then directed to review the file in camera and order the release of only those portions of the file which are relevant to the case. RSA 105:13-b, III. The remainder of the file must be treated as confidential and returned to the police department which employs the officer. Id.

According to the respondent, because of the confidentiality of police personnel files, when a prosecutor's office is notified by a police chief that there is information in an officer's file that warrants placing the officer on the "Laurie List," the prosecutor frequently does not know the reason for the "Laurie" designation. We infer from this statement that sometimes, when personnel files are submitted to the court in connection with a particular case, the disclosure is made directly to the court by the police department, and that even in cases in which the file passes through the hands of the prosecutor, it often is placed under seal by the police department before delivery. Thus, apparently it is not uncommon for prosecutors either to be unaware of the basis for an officer's inclusion on a "Laurie List," or to have only minimal information as to the basis for the listing. As a result, prosecutors often use the "Laurie List" as the basis for making a threshold determination as to whether there is potentially exculpatory information about an officer that should be submitted to the court for review. The consequence of this paradigm appears to be that, acting out of an abundance of caution and in order to preclude the prospect of being found to have failed in their Brady obligations, once an officer's name is placed on the "Laurie List," prosecutors routinely cause the officer's personnel file to be submitted to the court to determine whether it contains exculpatory information that must be turned over to the defense. Although this practice may be understandable from the prosecutors' perspective, given the

---

[5] By its terms, paragraph III also covers police officers who serve as prosecutors. As there is no indication from the record that any of the petitioners here have served or will serve as police prosecutors, we have no occasion to consider the application of RSA 105:13-b in such circumstances.

8

respondent's acknowledgment in the trial court that inclusion on the "Laurie List" carries a stigma, police officers have a weighty countervailing interest in insuring that their names are not placed on the list when there are no proper grounds for doing so. As this case demonstrates, in accommodating these competing interests, basic fairness demands that courts not invariably defer to the judgment of prosecutors with respect even to the threshold issue of what kind of adverse information should result in an officer's placement on a "Laurie List."

IV

Turning to the case before us, we must determine whether the petitioners are entitled to the relief they have requested — that is, to be removed from the "Laurie List" maintained by the respondent. The petitioners argue that their placement on the "Laurie List" affects significant constitutional liberty and property interests, inasmuch as a "Laurie" designation can tarnish their reputations and damage their careers. The respondent acknowledged during the hearing before the trial court that "the Laurie list is considered a kind of a death list" for the officers on it or "is given that stigma." Although the "Laurie List" is not available to members of the public generally, placement on the list all but guarantees that information about the officers will be disclosed to trial courts and/or defendants or their counsel any time the officers testify in a criminal case, thus potentially affecting their reputations and professional standing with those with whom they work and interact on a regular basis. Cf. State v. Veale, 158 N.H. 632, 639 (2009).

Because the issuance of an injunction is committed to the sound discretion of the trial court, we will uphold the court's decision unless it is tainted by error of law, clearly erroneous findings of fact, or an unsustainable exercise of discretion. See UniFirst Corp. v. City of Nashua, 130 N.H. 11, 14 (1987). Here, we conclude that the trial court unsustainably exercised its discretion and that the petitioners are entitled to be removed from the "Laurie List."

To reach this conclusion, we re-examine, and clarify, our decision in Laurie. Perhaps because the totality of the adverse information about Detective Laro that the State knowingly failed to disclose was so egregious, in Laurie we did not differentiate among the various types of information contained within his personnel files. Instead, we simply observed that the files at issue "disclose[d] numerous instances of conduct that reflect[ed] negatively on Laro's character and credibility." Laurie, 139 N.H. at 330. In particular, there was no doubt that evidence of Laro's long-demonstrated history of lies, deception, and incompetency "plainly would have been useful to the defendant upon cross-examination of Laro." Id. at 331. In short, the adverse information at issue in Laurie was probative of Laro's general credibility as a witness, and, as such, would likely have been admissible in any case in which Laro testified. See N.H.

9

R. Ev. 608(b) (providing that specific instances of the conduct of a witness may be inquired into on cross-examination if probative of untruthfulness); see also State v. Mello, 137 N.H. 597, 600 (1993) (distinguishing between evidence used to attack a witness's general credibility and evidence used to impeach specific testimony given by a witness).  For an officer such as Laro, being placed on a "Laurie List" and having the adverse information automatically disclosed to the court every time that officer is to be a witness makes sense and upholds the prosecutor's legal and ethical responsibility.

The situation with respect to the petitioners is quite different from that presented in Laurie.  First, unlike Laro's pattern of misconduct and untruthfulness, the only conduct at issue here is the petitioners' involvement in a single incident of alleged excessive use of force, and there is no suggestion that they attempted to lie about or cover up their conduct.  Even if the accusation were true, this incident, without something more (such as evidence that the petitioners lied or misrepresented the facts) would not be admissible to impeach the petitioners' general credibility because an instance of excessive use of force is not probative of truthfulness or untruthfulness.  See N.H. R. Ev. 608(b).  Indeed, even if a future case were to arise in which a claim of excessive use of force was made against one of the petitioners, the prior incident would not be admissible simply to show a petitioner's propensity to engage in such conduct.  See N.H. R. Ev. 404(b).  We recognize, of course, that the admissibility of evidence at trial does not necessarily mark the bounds of the prosecutor's disclosure obligations under Brady.  See Laurie, 139 N.H. at 332 ("It is sufficient for us to find that the evidence is material to the preparation or presentation of the defendant's case." (quotation omitted)).  However, the fact that adverse information regarding a police officer's background is not of the type usually admissible to attack the officer's general credibility has a strong bearing on the propriety of maintaining the officer's name on a list that is used as the basis for automatically disclosing the information to the trial court or the defendant in any case in which the officer may testify.

Second, and more importantly, although the petitioners were initially disciplined by the police chief for their alleged excessive use of force, the chief's decision was overturned by an arbitrator, a neutral factfinder, following a full hearing conducted pursuant to procedures agreed to in the CBA.  After an investigation, the attorney general also concluded that the petitioners' use of force in the incident was justified.  As a result of these determinations, references to the incident have now been removed from the petitioners' personnel files.  Given that the original allegation of excessive force has been determined to be unfounded, there is no sustained basis for the petitioners' placement on the "Laurie List."  It makes no sense that the threshold determination — that something was thought to be potentially exculpatory and worthy of an in camera review by the court, but has now been shown not to be of that character — should follow the petitioners every time they appear as witnesses.

10

Therefore, to the extent that the petitioners' names appear on the "Laurie List" maintained by the Hillsborough County Attorney's Office, we hold that the trial court unsustainably exercised its discretion in failing to order that their names be removed from said list. In light of the above ruling, we need not address the other relief requested by the petitioners or further consider their constitutional arguments. For the reasons stated above, we reverse the decision of the trial court and remand for further proceedings consistent with this opinion.

Reversed and remanded.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.

11